IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ELIZABETH A. RODEN, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION No. A-11-CA-809-SS |
| v. | § | |
| | § | |
| TEXAS MUNICIPAL POLICE | § | Removed from |
| ASSOCIATION, INC. | § | District Court of Travis County, Texas |
| | § | 53rd Judicial District |
| *Defendants.* | § | CAUSE NO. D-1-GN-11-002433 |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Texas Municipal Police Association, ("TMPA"), files its Motion for Summary Judgment seeking dismissal of all claims raised by Plaintiff Elizabeth Roden ("Roden").

### I. Summary Judgment Evidence and Factual Overview

Roden, the former Controller for Defendant TMPA, filed this lawsuit claiming breach of her employment contract, negligence, intentional infliction of emotional distress, and violations of the Civil Rights Act and the Family Medical Leave Act ("FMLA").

In her 2008-09 performance review, Roden was counseled about being "overbearing" and "short with others," and was informed that fellow employees felt uneasy approaching her with questions or concerns. (Exhibit 1, p. 43:11 – 43:22; 45:11 – 45:17). On August 5, 2010, Roden received a written reprimand from her then-supervisor Christopher Heaton[1] for being "rude, short, abrupt and condescending" to her subordinates, being "unprofessional," engaging in conduct that "demeans employee input," and engaging in actions that are "contrary to everything

---

[1] Roden testified that Mr. Heaton is an honest and trustworthy person. (Exhibit 1, p. 8:17 – 9:4).

we stand for at TMPA." (Exhibit 1, pp. 90:5 – 91:6; Exhibit 1B.) When Roden's conduct continued under a new manager, Roden was again counseled. In a memo dated Feb. 11, 2011, TMPA described Roden's continued demeaning treatment, informed Roden that her term employment contract would not be renewed when it expired in January 2012, and implemented reasonable instructions designed to prevent Roden from abusing subordinates in the future as she performed her duties. (Exh. 1, p. 132:4–132:16; Exh. 1A). For example, Roden was instructed not to have closed-door meetings with subordinates, to involve another manager in disciplinary discussions, and attempt to communicate in writing with employees when possible. *Id.*

Rather than accept this constructive criticism, Roden informed TMPA that she could not work under these conditions; Roden insisted that TMPA notify all employees that her employment would be ending as soon as she could find other employment. (Exhibit 1, pp. 166:14 – 168:8.) Roden requested, and TMPA permitted her, to work from home at least two days a week to facilitate her efforts to find other employment but otherwise required her to perform her job. *Id.*

In the winter of 2010, TMPA had hired an outside consulting firm to analyze its organizational structure. In the Spring of 2011, TMPA hired this same firm to perform an analysis of its accounting function. The consulting firm recommended changes to the accounting function, and TMPA then hired the firm to help implement the recommended changes. On May 5, 2011, TMPA asked Roden to return to working in the office five days a week so that she would be able to assist the consultant in making the recommended changes. (Exhibit 1, pp. 186:20 – 187:11; Exhibit 1C.) In response, Roden informed TMPA that she would need two days of vacation "to prepare for this schedule." *See id.* Roden testified in her deposition that these two days were needed only for "prayer." (Exhibit 1, pp. 191:14 – 192:5). Roden then

showed up at work on May 10 for a half day (taking the afternoon as vacation leave), and worked all day May 11, May 12, May 13. (Exhibit 1, pp. 197:1 – 198:13, Exhibit 1D).

TMPA was not made aware at that time, but May 13, 2011 was the last day Roden would work at TMPA. (Exhibit 1, p. 198:11 – 198:24). Roden then implemented her own plan to get paid for as long as possible without actually working. Sometime on or before Friday, May 13, 2011, Roden cleaned out her TMPA office and desk of her personal belongings and left in her desk drawer her TMPA credit card, building access fob, and her key to her office door. (Exhibit 1, pp. 231:23 – 239:4).

Starting Monday, May 16, 2011, Plaintiff abruptly requested a string of vacation days and a half-day to go to the doctor totalling two weeks of paid time; TMPA granted those requests. (Exhibit 1, pp. 213:10 – 213:16; 221:17 – 223:19; Exhibits 1E, 1F, 1G). Prior to this string of vacation time, Roden admits she had never made any requeests of TMPA that it accommodate any medical condition. (Exhibit 1 p. 224:4 – 224:7). And despite the fact that Roden purports to have needed medical leave starting Monday, May 30 (Exhibit 1, pp. 227:10 – 228:1; 263:15 – 266:5, Exhibits 1E, 1F, 1G, 1H, 1K), Roden admits that she was capable of performing her job and that no health care provider was telling her that she should not work due to any health condition. (Exhibit 1, p. 224:4 – 224:24). Roden admits she continued to look for and even interview for jobs throughout her so-called medical leave. (Exhibit 1, p. 224:25 – 227:9).

At the suggestion of her attorney (Exhibit 1, p. 290), on Thursday, May 26, Roden saw Dr. Anita D'Mello, M.D. ("Dr. D'Mello") and later that same day, emailed her supervisor stating, "My doctor has placed me on medical leave until 6/9/2011. Please refer to the attached letter." (Exhibit 1, p. 227:10 – 227: 15; Exhibit 1H.) The attached letter from Dr. D'Mello stated, "Elizabeth Roden is currently under my care. Please excuse her for 2 weeks. She may

return to work on 06/09/2011. If you require additional information please contact our office." (*See id.*)

As it had the right to do under the FMLA and Roden's contract, TMPA requested specific information to certify the purported need for leave. *See* 29 C.F.R. § 825.305 *et seq.* (Exhibit 1, pp. 239:24 – 240:13; Exhibit 1I.) Although Roden's lawyer sent subsequent additional requests to extend indefinitely Roden's medical leave, no additional information from a health care provider was sent to TMPA until June 14, 2011. (Exhibit 1, p.250:15 – 250:19; Exhibit 1J.) That purported certification was incomplete in that it did not identify a probable duration of Roden's condition or leave, did not explain how or whether Roden was limited in the performance of her duties, identified the need to miss work for "medical visits and treatments as needed" but did not explain in any way the need for the indefinite leave Roden had essentially placed herself on. (Exhibit 1J; *see* 29 C.F.R. §825.306). On June 21, 2011, TMPA's counsel wrote Roden's counsel requesting complete information. (Exh. 1, p. 261:21 – 262:10; Exh. 1M.)

No additional information was provided until Friday, July 8, 2012. On Friday, July 8, 2012 at 4:02 p.m., (the week of the July 4th holiday), Roden's lawyer sent TMPA's lawyer a letter and another medical certification form. (Declaration of Tom Nesbitt (Exh. 4) and Ex. 4A to Nesbitt Declaration). This certification form was far different than the one provided on June 14. Roden's lawyer demanded in the cover letter that TMPA immediately evaluate this form and immediately pay Roden sick pay for all of the days she had missed over the previous two months and grant her sick leave for the indefinite leave of absence she was claiming was medically necessary. Roden's lawyer stated, "I request a response to this request by close-of-business, Monday, July 11, 2011." *That was the very next business day*.

On July 12, 2011, Roden informed TMPA, through her attorney, that she was terminating her employment with TMPA. (Exhibit 1, p. 263:15 – 263:18; Exhibit 1K). On July 13, 2011, TMPA's attorney wrote to Roden's attorney to explain that TMPA disputed the legitimacy of the "certification" provided on July 8 and was in the process of lining up a physician to provide a second opinion as is TMPA's right under the FMLA. (Ex. 4B to Nesbitt Declaration; *see* 29 C.F.R. §825.307(b)). TMPA requested that Roden submit to a second opinion in order obtain sick pay for the prior two months. *Id.* The request stated that the consequence of refusing to participate in a second opinion would be non-payment of sick leave. Roden's lawyer never agreed to the request to submit to a second opinion and filed this suit seeking, among other things, sick pay for the period of May 30 – July 12, 2011.

Roden admits that she had no physical limitations during this so-called medical leave and was only limited in that she had a hard time concentrating. (Exhibit 1, pp. 227:24 – 229:19). She also admits that she had no limitations on her ability to apply for jobs and did in fact apply for jobs during this time she was supposedly home "sick" and seeking sick leave pay. (Exhibit 1, pp. 229:17 – 230:12). She also admits that neither her treating physician, Dr. D'Mello, her counselor Jerald Andersen nor any other health care provider ever told her she should not go to work or suggested that she not go to work. (Exhibit 1, 231:1 – 231:22). Roden's theory seems to be that she could be a controller or an accountant anywhere *except at TMPA* and that she was therefore entitled to paid sick leave.

Roden now asserts six causes of action which center on the following allegations: (1) TMPA limited her disciplinary authority because of her prior abuse of employees, (2) TMPA did not pay her for accrued vacation and sick leave when she resigned; (3) TMPA intentionally inflicted emotional distress upon her; and (4) TMPA created a hostile working environment

5

when two offensive emails were circulated to the executive staff in October 2010. However, each of Roden's causes of action fail as a matter of law and this case should be dismissed in its entirety.

## II.    <u>Summary Judgment Standard and Argument</u>

Under traditional summary judgment standards, the Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the movant has identified the grounds for summary judgment, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986). A party opposing a motion for summary judgment may not rely merely upon the allegations of her pleadings, but must adduce significant probative evidence in support of such allegations. *Liberty Lobby*, 477 U.S. at 248. Because Roden has no such probative evidence to support her claims, TMPA is entitled to summary judgment as a matter of law.

### A.    **Breach of Contract**

Roden acknowledges that TMPA did not terminate her employment contract; Roden did. (Exhibit 1, p. 144:7 – 144:10). As best TMPA can tell, Roden's breach of contract claim consists of two allegations. First, Roden contends that the restrictions TMPA imposed on

6

February 11 to prevent Roden from abusing her staff constituted a breach of Roden's "right" to perform certain duties for TMPA. Second, Roden contends that TMPA was obligated to pay her sick leave or other pay and benefits for the days starting May 30, 2011 when she was not working and was instead claiming to be sick while applying for and interviewing for other jobs.

Summary judgment should be granted because TMPA did not have a duty to refrain from taking steps designed to protect Roden's subordinates from her abusive treatment. And Roden was not entitled to any sick leave pay because (a) the contract does not require any payment of sick leave upon termination, (b) Roden had already used all accrued sick leave for the year at the time of termination, and (c) Roden was not sick and failed to provide satisfactory evidence that she was sick.

### 1. The February 11 Restrictions Did Not Breach the Contract

First, TMPA had no duty to refrain from placing restrictions on Roden's ability to unilaterally discipline employees. Roden fundamentally misunderstands the nature of the duties in her contract. The duties outlined in Section 2 of the contract contain TMPA's expectations of Roden. They are obligations of *Roden*, not obligations upon TMPA to always allow her to perform such duties.

Second, TMPA's actions as alleged by Roden do not violate the contract. In her deposition, Roden specifically identified the provisions of the Feb. 11, 2011 memo that she believed violated her employment contract and constituted breach or repudiation:

| Excerpt from Feb. 11, 2011 Memo Roden contends violates her employment contract (Exhibit 1A) | Employment Contract provision Roden Contends it violates (A true and correct copy of Roden's employment contract is attached hereto as Exhibit 1L. Exhibit 1, p. 8:2 – 8:12) |
|---|---|
| II.1.    Further    mistreatment   of   TMPA employees in any manner will not be tolerated and   will   subject   you   to   termination. Mistreatment includes any rude, short, abrupt, | 2.n. The Controller is responsible for the following: Supervising the Accounting Clerk. (Exhibit 1L, p. 2.) |

| | |
|---|---|
| condescending, demeaning, or unprofessional behavior, calling employees names, raising your voice at employees, belittling employees, or humiliating employees. | |
| II.3. You will have no closed-door meeting with any of your subordinates. | *Roden only indicates in her deposition that this directive interfered with her ability to supervise her employees.* Exh. 1, pp. 155-158. |
| II. 4. You will have no disciplinary authority over any of your subordinates. If an employee needs to be counseled or corrected, then you must first consult with Kevin Lawrence, Mitch Landry, or Randy Doubrava, and they must be present when communicating this correction or counsel to any employee. | 2.o. The Controller is responsible for the following: Establishing and monitoring the Accounting Policies of the organization. (Exhibit 1L, p. 2.) |
| II.5. When at all possible, instructions to employees on their duties or tasks shall be provided to them in writing, either by email or a typewritten memorandum. *See* Exhibit 1, p.146. | Roden does not clearly identify a contract provision this directive violates but states, "Again, item number 1 [further mistreatment] which is a false accusation, stated the tone that any communication that I had with an employee was abusive." Exhibit 1, p. 162. |
| II.6. For your information, employees under your direction will be given specific, written permission to come and visit with Kevin Lawrence, Mitch Landry, or Randy Doubrava to report any further occurrences of mistreatment. | 2.n. The Controller is responsible for the following: Supervising the Accounting Clerk. 2.o The Controller is responsible for the following: Establishing and monitoring the Accounting Policies of the organization. (Exhibit 1L, p. 2; Exhibit 1, pp. 163-166.) *Again Roden contends this generally prevents her from supervising her employees.* |
| II.8.h. While employed with TMPA, you are still responsible for: (h) Transferring responsibility and maintaining and securing the Organization's personnel files to the Director of Administration and Special Programs, | *Roden again generally asserts that this directive changes her responsibilities and affects her ability to supervise her staff. See* Exhibit 1, pp. 147-48. |
| II.8.g. While employed with TMPA, you are still responsible for: Coordinating with the new Director of Administration and Special Programs with regard to the Human Resources function of TMPA. *See* Exhibit 1, pp. 137-141. | *Roden again generally asserts that this directive changes her responsibilities and affects her ability to supervise her staff. See* Exhibit 1, pp. 147-48. |

Even if the facts alleged by Roden are true, the Feb. 11 restrictions as a matter of law do not constitute a breach or repudiation of her contract. First, Items 1, 6, 8h, and 8g have no effect on Roden's contract as these items were either already required under her original contract or merely restate general expectations any employer would have of an employee. *See* Exhibit 1L. Second, Items 3, 4, and 5 only change the method or circumstances by which Roden was to perform her duties. *See* Exhibit 1A. More importantly, however, Roden has identified no change so significant that it placed her in "a subordinate position, or one substantially different in its work and duties." *See Baylor Univ. v. Colely*, 221 S.W.3d 599 (Tex. 2007). The sum of the changes to Roden's contract were that (1) Roden not mistreat any TMPA employees (a general expectation of any employee); (2) Roden not have any closed-door meeting with any of her subordinates; (3) a member of the executive staff be present during her discipline of a subordinate; (4) when possible, instructions to employees on their duties or tasks be provided to them in writing; and (5) employees had permission to come and visit with the executive staff to report any mistreatment.

When pressed, Roden acknowledged that these limitations still afforded her ample opportunity to supervise her staff. (Exhibit 1, pp. 157:17 – 161:24). In fact, Roden testified that she continued to perform her duties following the February 11 memo. (Exhibit 1, p. 144:7 – 145:1). There is no evidence that TMPA ever terminated, disciplined, or faulted Roden in any way for failing to perform the duties that Roden claims were taken away from her.

TMPA had no duty to refrain from imposing these restrictions on an employee with a documented history of abusing staff. But even if Roden tries to characterize these restrictions as somehow fundamentally altering the workplace, her clam fails. In *Baylor*, a Baylor University employee contended that she was demoted in breach of her contract. *See Baylor Univ.*, 221

9

S.W.3d at 600. However, the *Baylor* Court concluded that while there was evidence that her responsibilities were altered, there was no evidence that Baylor ever required her to perform any job other than the one specified in her last annual contract. *Id*. at 604. And, "even if her work varied substantially over time and in the end was more clerical than she desired, there is no evidence that it was not the work of [the position specified in her annual contract]." *Id*. Rather, the evidence established that she continued in her academic position. *Id*. (relying on *Kramer v. Wolf Cigar Stores*, 91 S.W. 775 (Tex. 1906) (considering whether the employer required the performance of duties that were substantially different).

Here, Roden's pay, benefits, title (*See* Exhibit 1, p. 150:5 – 150:13), work and duties remained the same – in no way can she identify a substantially different duty that she was assigned or demonstrate that she was required to perform any job other than the one specified in her contract. The evidence conclusively establishes that TMPA did not breach or repudiate the contract when it issued Roden the Feb. 11, 2011 memo. Roden's breach of contract claim should be dismissed.

## 2. *Roden Is Not Entitled to Any Additional Vacation or Sick Leave*

In her second claim of breach of contract, Roden claims that TMPA failed to pay her for "her accrued, unused vacation leave and/or accrued, unused sick leave as explicitly provided for by the Contract and/or TMPA policy." *See* Plaintiff's Original Petition, p. 18.

Roden's employment contract only speaks to vacation and sick leave in the following ways: (1) Roden will accrue 15 paid vacation days per year and be allowed 12 days of sick leave per year; and (2) Roden shall accrue unused sick leave from one year to the next, and that Roden may not carry over accrued vacation days into the subsequent calendar year without the consent of the TMPA Board of Directors. *See* Exhibit 1L, ¶ 6. The contract is otherwise silent as to

10

how vacation and sick leave will be handled when Roden's employment terminates, and states that the employment contract is the entire agreement between the parties. *See* Exhibit 1L, ¶ 7.

And, notably, the TMPA Handbook specifically provides "Please understand that the policies in the Employee handbook are not a contract, express or implied, guaranteeing employment for any specific duration. No supervisor, manager, or representative of the Association other than the Executive Director, with the consent of the Board of Directors, has the authority to enter into any agreement with you for employment for any specified period or to make any promises or commitment contrary to the foregoing...." *See* Exhibit 3A, p. 1. Moreover, Texas courts have held that employee handbooks generally do not create contracts and that this is "particularly true if the handbook contains a disclaimer." *See Brown v. Sabre, Inc.*, 173 S.W.3d 581, 585-86 (Tex. App.—Fort Worth 2005, no pet.); *Fed. Exp. Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex. 1993) ("A disclaimer in an employee handbook, [] negates any implication that a personnel procedures manual places a restriction on the employment at will relationship."); RESTATEMENT (SECOND) OF CONTRACTS § 21 (1979) (manifestation of intention that a promise shall not affect legal relations may prevent the formation of a contract). Thus, any reliance by Roden on the TMPA Handbook to support a breach of contract claim is misplaced.

In sum, then, Roden's contract can provide the only support for her claim that TMPA breached the contract by failing to pay her for accrued vacation and sick leave. However, the contract only speaks to accrual and does not support any claim for payment of any cash value for the accrued leave upon termination.

Moreover, Roden had already used more accrued vacation than she had for 2011 at the time she stopped showing up for work. The contract provides that Roden would "accrue fifteen

(15) paid vacation days per calendar year, at the rate of one and one-quarter (1 ¼ ) days per month" and that she "may not carry over accrued vacation days into the subsequent calendar year without the consent of the Board of Directors of TMPA." *See* Exhibit 1L, ¶ 6. Although the contract allowed Roden to roll over additional vacation from the prior year based on a vote by the board of directors, there is no evidence the Board of Directors consented to Roden's carryover of any accrued time. As such, at the time of her resignation, Roden had used more than the number of vacation days she could have accrued for the 2011 year. (It should be noted that TMPA had presumed that she had available sick and vacation leave up through July 12[th]. However, after Roden resigned, TMPA learned that she had actually improperly rolled over her vacation leave, and that in reality she had exhausted all vacation leave.) (The affidavit of TMPA's Sr. Accountant is attached hereto as Exhibit 2 (showing use of 21.3 days).

Finally, as described above in the facts section and discussed in greater detail below in the FMLA section, the evidence establishes that Roden was not actually sick and therefore not entitled to any sick leave pay.

## B. Negligence

Roden also asserts a claim of negligence contending that TMPA had a duty to perform the Contract or the undertakings in the Contract with care and "cooperate to the extent necessary for performance of the Contract." *See* Plaintiff's Original Petition, p. 19. Roden asserts that TMPA breached its duties under the Contract and that breach was "the actual and proximate cause of damages suffered" by Roden.

It is well-settled that "if an independent negligence duty does not otherwise exist, [there is] no authority or rationale for holding that a negligent breach of contract somehow transforms the associated contract claim into a tort claim or creates a new tort claim." *Univ. of Tex. Med.*

*Branch v. Harrison*, 2003 Tex. App. LEXIS 6768, n. 5 (Tex. App.—Houston 2003, pet. denied). *See also Dolenz v. Old Republic Ins. Co.*, 1995 Tex. App. LEXIS 3996, *12 (Tex. App.—Dallas 1995) (holding that where defendant did not breach a duty separate from that owed under the contract, then negligence is not a viable cause of action ).

Roden bases her negligence claim on nothing more than TMPA's alleged duties under the contract. A party "cannot create liability in tort by merely alleging tort damages." *Dolenz*, 1995 Tex. App. LEXIS 3996, *12. In addition, under Texas's workers' compensation system, the exclusive remedy of an injured worker against an employer who has workers' compensation insurance coverage is the recovery of "workers' compensation benefits." *See* TEX. LAB. CODE ANN. § 408.001. TMPA was in fact a subscriber to workers compensation insurance coverage. *See* Exhibit 2. Thus, the law and evidence conclusively establish that the facts do not support a cause of action with regard to negligence. Accordingly, by her own pleading, Roden has stated no valid cause of action for negligence and her claim for negligence must be dismissed.

**C.     Intentional Infliction of Emotional Distress**

Roden also contends that TMPA's actions constitute intentional infliction of emotional distress (IIED). Without citing any specfic instances in her petition of IIED, Roden generally asserts that "[t]hrough the intentional and/or reckless actions and ommissions by TMPA, designed to coerce her to leave her job, Ms. Roden suffered severe emotional distress...." *See* Plaintiff's Original Petition, p. 20. She further states that there was a  "calculated, sustained, intentional, and/or reckless campaign by TMPA against Roden" and that "her condition was the result of the work enviornment at TMPA" . . . "an environment specifically crafted to make Ms. Roden so miserable that she would choose to leave her job." *Id.*

To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65, (Tex. 1998). Extreme and outrageous conduct is conduct "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). It is for the court to determine, in the first instance, whether a defendant's conduct was extreme and outrageous. *Gte Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 616 (Tex. 1998).

Roden has failed to identify any conduct by TMPA in the entirety of her petition or in her testimony in her deposition that would rise to the level of extreme and outrageous conduct as a matter of law. At best, Roden has alleged (1) that she received emails that were offensive in nature but not directed at her; (2) that Roden was not provided an opportunity to respond to allegations against her made by other employees; (3) that on one occasion years ago she was allegedly called a lying sack of shit; (4) that certain responsibilities of Roden's were removed or altered; (5) that her displinary authority over her subordinates was restricted so that another executive staff member should be involved; (6) that another employee referred to her as the wicked witch of the west; (7) that TMPA isolated her from the new regime (although Roden herself requested that she be allowed to work from home, which was permitted for approximately 3 months); (8) that in March 2011 she was offered a letter of resignation that guaranteed her salary for a certain period of time even if she found other work; (9) that she was expected to perform tasks assigned to her by an accounting project manager; (10) that she was

informed that her employment contract would not be renewed; (11) that she was asked to supply additonal information regarding the extenstive amount of sick leave she was requesting; and (12) that she was not paid sick leave while her leave was being substantiated.

While TMPA strongly disputes these allegations, none of them, individually or in sum, constitute extreme or outrageous conduct. *Compare Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438 (Tex. 2004) (that employer allowed a corporate culture of insensitive jokes relating to women and minorities falls short of constituting extreme and outrageous conduct; evidence showed only a handful of instances of off-color jokes being told among employees over a period of several years in a company with 1,000 sales people); *GTE Southwest, Inc.*, 998 S.W.2d at 613 (workplace and employment matters such as "criticism, lack of recognition, and low evaluations" are not actionable, even if they are unpleasant or unfair). *See also Dillard Dept. Stores v. Gonzales,* 72 S.W.3d 398 (Tex. App.—El Paso 2002, pet. denied) (the conduct did not rise to the level of IIED where the supervisor hugged his employee, called him pet names, put his hand on his shoulder, rubbed his back, and, in the presence of others, made off-color remarks implying homosexuality, leaned against the employee in such a way that the employee could feel his genitals, and when the supervisor learned that his conduct was offensive to the employee, he apologized and changed his behavior).

As Justice O'Neill noted:

"Undoubtedly, most conduct that would support a sexual-harassment claim is outrageous and intolerable, presumably the very reason the Legislature made such conduct statutorily actionable. But only when such behavior repeatedly becomes so forceful and intimidating that a reasonable person would feel immediately threatened or afraid can a court conclude with sufficient certainty that the actor intended to cause severe emotional distress or that severe emotional distress was the primary risk of the actor's conduct. *See Standard Fruit & Vegetable Co.*, 985 S.W.2d at 63. The record here reflects numerous instances of repugnant behavior and poor judgment. It does not, however, demonstrate a regular pattern of severely abusive behavior "'so outrageous in character, and so extreme in

15

degree,'" as to support a claim for intentional infliction of emotional distress. *Twyman*, 855 S.W.2d at 621 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965))."

*Hoffmann-La Roche, Inc.*, 144 S.W.3d at 454 (concurring opinion).

Rather, to support a claim of IIED the law requires outrageous and intolerable conduct like that in *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605 (Tex. 1998). There, the court recognized that being purposefully humiliated and intimidated, and being repeatedly put in fear of one's physical well-being at the hands of a supervisor rises to the level of extreme and outrageous conduct. *Id*. at 617. That conduct included using the harshest, most vulgar obscenities; repeatedly physically and verbally threatening and terrorizing employees; "charging" employees by rushing up to them with balled fists and lowered head, stopping uncomfortably close to them while yelling; pounding fists; flying into a rage because one employee left her purse on a chair and another her umbrella on a filing cabinet; repeatedly threatening to terminate employees without justification; forcing an employee to stand in front of him for as long as thirty minutes while he reviewed papers and talked on the phone; screaming when he discovered a spot on the carpet, forcing an employee to clean spots on her hands and knees; forcing employees to vacuum nightly although employer employed a janitorial service for that purpose; and forcing an employee to wear a post-it on her shirt that said, "don't forget your paperwork." *See id*.

In the present case, the actions complained of, even if true, do not even come close.

**D.     Hostile Work Environment**

Roden also claims that TMPA violated the Civil Rights Act, 42 U.S.C. 2000 by sending or allowing to be sent two emails which contained alleged discriminatory content. Roden complains about two emails: (1) an Oct. 3, 2010 email sent by Josh Thurlkill to the Executive Staff and the Board of Directors which showed a photograph of the showing a woman in a low

cut shirt; and (2) Oct. 4, 2010 email sent by Kevin Lawrence to the Field Representatives and the Executive Staff showing a track and field event in which the runner simulated sexual intercourse with a female under a blanket before finishing the race.[2] (True and correct copies of these emails are attached hereto as Exhibits 3B and 3C.) Roden admits however that after speaking with TMPA general counsel about these emails, "the circulation of these type of emails appeared to end." *See* Plaintiff's Original Petition, p. 22. Roden contends that these emails created an intimidating, hostile, and offensive work environment and demeaned her and other women in the organization.

In order to establish a hostile work environment claim, a claimant must demonstrate that "(1) she is [a] member of a protected group; (2) she was the victim of uninvited sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a 'term, condition, or privilege' of [claimant's] employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action." *Harvill v. Westward Commc'n, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005). However, for purposes of summary judgment, plaintiff cannot show that the harassment was based on sex, that the harassment affected a term, condition, or privilege of her employment, or that her employer failed to take prompt remedial action. Rather, the evidence conclusively establishes the contrary.

### 1. The harassment was not based on sex.

"The 'critical issue' in determining whether workplace activities constitute harassment based on sex is 'whether members of one sex are exposed to disadvantageous terms or conditions

---

[2] Roden indicated in her deposition that other than the actions identified in her EEOC complaint there were no other incidences of sex discrimination against her personally. *See* Exhibit 1, pp. 293-295. The EEOC complaint concerned only the two emails identified herein. (*See* Exhibit 3E, true and correct copies of excerpts from Roden's EEOC Complaint.) Moreover, a Title VII cause of action may be based only upon the specific complaints made by the employee's initial EEOC charge, and also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination. *See Fellows v. Universal Restaurants, Inc.*, 701 F.2d 447, 451 (5th Cir. 1983).

of employment to which members of the other sex are not exposed.'" *Reine v. Honeywell Int'l, Inc.*, 362 Fed. Appx. 395, 397 (5th Cir. 2010), *cert. denied*, 2010 U.S. LEXIS 6545 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, (1998)). "Title VII is not a shield against harsh treatment at the workplace; it protects only in instances of harshness disparately distributed." *Id.* (quoting *Jackson v. City of Killeen*, 654 F.2d 1181, 1186 (5th Cir. 1981)). *See also Butler v. Ysleta*, 161 F.3d 263 (5th Cir. 1998) (sending of offensive material to both men and women is evidence that the workplace itself, while perhaps more sexually charged than necessary, was not sexually charged in a way that made it a hostile environment for either men or women.)

The two emails that Roden complains of were not sent specifically to Roden and were not based on sex. Neither email exposed members of one sex to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. In fact, the first email was geared toward rival football teams. *See* Exhibit 3B. And, the second email was a joke aimed at a male co-worker. *See* Exhibit 3C ("Pretty sure that is Noel in lane 2."). Moreover, the emails were sent to the entire executive staff and others which included both men and women. Accordingly, it cannot be said that the complained of harassment was based on sex.

## 2. The harassment did not affect a term, condition, or privilege of claimant's employment.

Harassment affects a "term, condition, or privilege of employment" if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). Workplace conduct "is not measured in isolation." *Id.* In order to deem a work environment sufficiently hostile, "all of the circumstances must be taken into consideration." *Id.* This includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

18

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* To be actionable, the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). *See also Hockman v. Westward Communic,* 407 F.3d 317, 329 (5th Cir. 2004) (conduct did not rise to the level of actionable harrassment where alleged harasser (1) commented to the plaintiff that "you have big thighs" and "your elbows are the same color as your nipples"; (2) attempted to look down the plaintiff's clothing several times; (3) touched the plaintiff's arms several times, once rubbing his hand from her shoulder down to her wrist; and (4) on two occasions, patted his lap and remarked "here's your seat."). The Fifth Circuit has recongized that the the law was only meant to bar conduct that is so severe and pervasive that it destroys a woman's opportunity to succeed in the workplace. *See Shepherd v. Comptroller of Public Accounts of State of Texas*, 168 F.3d 871, 874 (5th Cir. 1999) (sexual teasing and some touching over a period of two years was "not severe" because it was "not the type of extreme conduct that would prevent [the plaintiff] from succeeding in the workplace.)

Roden has only identified two emails in her sexual harassment claim and neither constitute severe or pervasive conduct. The conduct did not alter the conditions of Roden's employment or create an abusive working environment. In fact, after Roden complained, no mention was made of these emails and the circulation of those type of emails ended. The emails were not physically threatening or humiliating, nor did they interefere with Roden's work performance. Indeed, the emails in no way destroyed her opportunity to succeed in the workplace. *Compare Kimble v. Georgia Pacific Corp.*, 245 F. Supp. 2d 862, 871, n.9 (M.D. La. 2002) ("Plaintiff's sex discrimination claim regarding 3 offensive e-mails appears to this Court to

19

be an allegation of sexually hostile work environment. .... Not only has the Plaintiff failed to make out a prima facie case of hostile environment, three isolated incidents over several years are not likely to amount to a "discriminatory change in the terms and conditions of employment.") (citing *Shepherd*, 168 F.3d at 874). (Notably, the EEOC also stated that it "is unable to conclude that the information obtained establishes violations of the statutes." *See* Exhibit 3E.) Accordingly, as a matter of law, it cannot be said that the harassment affected a term, condition, or privilege of Roden's employment. And, Roden's claims regarding hostile work environment should be dismissed.

### 3. TMPA took prompt remedial action.

Even if Roden can somehow establish that TMPA's conduct was based on sex and did affect a term, condition, or privilege of her employment, summary judgment is still appropriate on her hostile-work-environment claim. To prevail, Roden must present some evidence that the employer failed to take prompt remedial action upon learning of the alleged harassment. *Hockman v. Westward Communic*, 407 F.3d 317, 329 (5th Cir. 2004). When a company, once informed of allegations of sexual harassment, takes prompt remedial action to protect the claimant, the company may avoid Title VII liability. *Id.* (quoting *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 402 (5th Cir. 1993)). Prompt remedial action is action "'reasonably calculated' to end the harassment." *Id.*

In the present case, Plaintiff also has no evidence to show that her employer failed to take prompt remedial action. In fact, Plaintiff pleads in her original petition that "subsequent to [Roden's] conversation with [TMPA counsel], . . . ., the circulation of these type of emails appeared to end." *See* Plaintiff's Original Petition, p. 22. In fact, general counsel for TMPA advised against sending these type of emails. Such action was reaosnably calculated to end the

alleged harassment because it did in fact end the alleged harassment. Accordingly, TMPA has conclusively established that it did not subject Roden to a hostile work environment.

**E.    FMLA**

Roden also contends that TMPA violated the FMLA. First, Roden was not an "eligible employee" under the FMLA because TMPA did not have 50 or more employees at the time of Roden's request for leave was made. Under the FMLA, the term "eligible employee" does not include "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." *See* 29 USCS § 2(B)(ii); *Gibson v. Transp. Drivers, Inc.*, 2006 U.S.Dist. LEXIS 12272 *14 (S.D. Tex. 2006). The determination of whether an employee is "eligible" under the FMLA is made at the time the employee requests leave. 29 C.F.R. § 825.110(e); *Gibson*, at *14.

At the time Roden requested her leave, May 26, 2011, TMPA employed less than 50 employees at all worksites combined. *See* Exhibit 2.

Second, even if TMPA was covered by the FMLA, Roden was not entitled to the leave for which she now seeks pay because she was not medically incapable of working and failed to participate in the certification process as the FMLA requires. The FMLA provides that eligible employees of eligible employers may take 12 weeks of unpaid leave for five categories of situations. 29 U.S.C. § 2612(a). The only category that is even arguably applicable to Roden is leave "because of a serious health condition that ***makes the employee unable to perform the functions of the position of such employee.***" 29 U.S.C. §2612(a)(1)(D). The plaintiff bears the burden of establishing that she was eligible for leave. *Comeaux-Bisor v. YMCA of Greater Houston*, 2008 U.S.App. LEXIS 18369 **5 (5th Cir. 2008).

21

As described in Section I above, Roden was always able to perform the functions of her position; she just didn't want to. Roden testified that she did not have any illness that made her incapable of doing her duties, that she could use a computer, use a phone, do math, perform accounting functions, apply for jobs, and interview for jobs. (Exhibit 1, p. 224:4 – 227:9).

As discussed in Section I above, for weeks Roden failed to provide a completed FMLA certification. And when she finally provided a form that was (at least on its face) complete, she resigned two business days later and refused TMPA's request for a second opinion. TMPA was entitled to obtain a second opinion from Roden. 29 C.F.R. §825.307(b). Roden's refusal to participate in a second opinion rendered her ineligible for the benefits of the FMLA. 29 C.F.R. §825.305(d).

## PRAYER

For the above reasons, TMPA asks that the Court grant summary judgment and dismiss all claims asserted by Plaintiff with prejudice, award costs to TMPA, and grant TMPA all further relief to which it may be entitled.

Respectfully submitted,

/s/ Thomas A. Nesbitt
Thomas A. Nesbitt
 State Bar No. 24007738
tnesbitt@deshazonesbitt.com
Scott F. Deshazo
 State Bar No. 24011414
sdeshazo@deshazonesbitt.com
Rachel L. Noffke
 State Bar No. 24007754
rnoffke@deshazonesbitt.com
DeShazo & Nesbitt LLP
809 West Avenue
Austin, Texas 78701
Telephone: 512 617 5560

Facsimile:   512 617 5563
**ATTORNEYS FOR DEFENDANT**
**TEXAS MUNICIPAL POLICE ASSOCIATION**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document was served on the following known Filing Users through the NEF, on this 17th day of August, 2012:

Robert J. Bozelli
Edward P. Watt
Texas Bar No. 20976500
141 East Mercer Street, Suite C
Dripping Springs, Texas 78620

/s/ Thomas A. Nesbitt
Thomas A. Nesbitt

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ELIZABETH A. RODEN, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION No. A-11-CA-809-SS |
| v. | § | |
| | § | |
| TEXAS MUNICIPAL POLICE | § | Removed from |
| ASSOCIATION, INC. | § | District Court of Travis County, Texas |
| | § | 53rd Judicial District |
| *Defendant.* | § | Cause No. D-1-GN-11-002433 |

## **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On this day the Court considered Defendant's Motion for Summary Judgment. Having considered the motion and any evidence, and having conducted a hearing, the Court is of the opinion that the motion should be GRANTED.

IT IS THEREFORE ORDERED that all claims and causes of action asserted by Plaintiff Elizabeth Roden are hereby DISMISSED WITH PREJUDICE.

Defendant shall have and recover its costs of court, for which let execution issue.

All relief not expressly granted is hereby DENIED.

Signed this _____ day of _____, 2012

_____
Sam Sparks
United States District Judge